UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID BISHOP, | Case No. 19-CV-420 (NEB/ECW) |
| Plaintiff, | |
| v. | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| ST. JUDE MEDICAL S.C., INC., | |
| Defendant. | |

Plaintiff David Bishop sued his former employer St. Jude Medical S.C., Inc. ("SJM") for disability discrimination, raising several claims under California state law. The Court now considers SJM's motion for summary judgment on all claims and Bishop's motion for summary judgment on the disability discrimination claim. For the reasons that follow, the Court grants SJM's motion and denies Bishop's motion.

BACKGROUND

Bishop was hired in 1999 to work for SJM as a technical services specialist. (ECF No. 147 at 5–155 ("Bishop Dep.") at 11, 15.) When his employment ended in August 2016, Bishop was working as a senior clinical instructor in Global Sales Marketing. (*Id.* at 14.)

In early 2015 Bishop was diagnosed with transverse myelitis. (*Id.* at 38.) His symptoms first appeared in February 2015, including pain in his back, neck, and head. (*Id.* at 38–39.) The pain caused Bishop to collapse at work. (*Id.* at 43–44.) As a result, Bishop

took medical leave for two months. (*Id.* at 47.) His doctors thought he needed more recovery time, but Bishop wanted to return to work. (*Id.* at 50–51.) He returned with a work restriction: no climbing and no lifting more than 20 pounds. (*Id.*) He also struggled to sit for long periods of time because of the pain and nerve impairment caused by the condition. (*Id.* at 58.)

Bishop's manager, Michael Basnight, knew that Bishop had collapsed at work but did not know the details of Bishop's medical condition or the reason for his leave. (ECF No. 166-2 at 13–14; *see also* ECF No. 147 at 218–19, 249–50, 300–301 (Bishop's other managers indicate some knowledge of a leave but no specific knowledge of its reasons).) Basnight apparently did not even know about Bishop's work restrictions. (ECF No. 147 at 193–234 ("Basnight Dep.") at 219.)

Besides the work restrictions, Bishop asked for one other accommodation during his time at SJM. In early 2016, Bishop told Basnight that it would not be possible for him to travel to three cities in four days because of "all that sitting and flying." (Bishop Dep. at 59.) Basnight did not require Bishop to travel, and no issues arose from that request. (*Id.* at 62.)

*Texas training.* In August 2016, Bishop traveled from his home office in Sylmar, California to Austin, Texas to lead a 10-day training seminar for 15 to 20 trainees. (*Id.* at 22, 64, 75.) What happened at that training is not clear; the record is replete with questions of fact about who said what, where comments were made, and what order they were

2

made in. One thing is clear: Bishop had an awful day at work on August 22—the eighth day of the training. (*Id.* at 75.) So bad, in fact, that it ended when he resigned and left early.

When Bishop arrived at the training that morning, he expected the equipment he needed to use—a simulator—to be working and ready to go. (ECF No. 166-1 at 33.) It was not. Understandably, he found this frustrating. (*Id.*) He attempted to fix the simulator, which required great focus. (ECF No. 152 ¶ 15.)

Throughout this, Bishop was in pain. (*Id.* ¶ 16.) He got up to get a glass of water in order to stretch his legs and take more of his pain medication. (Bishop Dep. at 91–92; *see also id.* at 70–73 (discussing the pain medications Bishop was taking).) While in the cafeteria, Bishop spoke to David Brin, a director and Basnight's peer. (Basnight Dep. at 202, 204.) Bishop does not remember that conversation, but Basnight testified that Bishop was talking to Brin in a raised voice and threatened to quit if Brin terminated another employee. (*Id.* at 204; Bishop Dep. at 81–82.) Basnight, hearing the conversation, thought it was inappropriate and pulled Bishop aside. (Basnight Dep. at 205.) During that conversation, Basnight raised an unrelated problem; apparently, some of Bishop's peers found him uncooperative, and Basnight wanted to clear the air. (Basnight Dep. at 200–201, 205–07.) Basnight and Bishop continued talking for five to ten minutes. (Bishop Dep. at 100; Basnight Dep. at 209.) They moved from the cafeteria to the lobby. (Bishop Dep. at 100.)

Throughout the conversation, Bishop was uncomfortable, in pain, and trying to get away from Basnight so he could take his medications. (*Id.* at 101.) Bishop told Basnight that he was in pain and wanted to return to his hotel room, but Basnight continued to follow Bishop. (*Id.* at 96, 104, 108.) According to Basnight, he was worried that Bishop would cause more of a scene. (Basnight Dep. at 211, 223.)

Basnight's fears were warranted. At some point during this conversation, Bishop asked Basnight what he needed to do for Basnight to leave him alone, then shouted, "What do you need me to do? Just quit and walk away from you? Is that the only way I can get away from you at this point." (Bishop Dep. at 101.) Basnight told Bishop, "You can't quit. I won't let you resign." (*Id.*) This eventually devolved into an expletive-laced outburst in which Bishop quit several times.[1]

After this, Bishop walked away from Basnight to the classroom where he was teaching the seminar. (Bishop Dep. at 103.) Basnight followed. (*Id.*) Bishop asked Jeff Kert—his co-instructor—if he could return to his hotel room to rest. (*Id.* at 106.) Kert said

---

[1] There is a dispute of fact about when this happened, what Bishop said, and how many times he quit. Basnight describes Bishop as being agitated, throwing his hands in the air, and shouting that he "f-in quit" from the lobby, to the classroom, and to the car. (Basnight Dep. at 222–23; ECF No. 166-3 at 17; Bishop Dep. at 109.) According to Kert, Bishop said he "F'ing quit" when Bishop and Basnight walked into the classroom. (ECF No. 147 at 282.) Bishop's testimony conflicts with parts of both stories, but at times Bishop does not remember what he said or what happened. (Bishop Dep. at 96–106, 109–111.) As discussed below, these questions of fact are not material because all three agree that Bishop resigned. In addition, whatever its length, there is no question that Bishop had an outburst, quit, and shouted expletives.

4

that would be fine. (*Id.*) Basnight interrupted the conversation between Bishop and Kert to tell Kert that Bishop wanted to quit. (*Id.* at 108.) Kert told Bishop not to quit and sent him off to rest in his hotel room. (*Id.*)

Bishop left to call a car to take him to his hotel. (*Id.* at 109.) Basnight followed. (*Id.*) As they waited for Bishop's car to come, Basnight continued to talk to Bishop. (*Id.*) Bishop does not remember the details of the conversation, (*id.* at 110), but according to Basnight, Bishop quit again. (ECF No. 166-3 at 19.)

Bishop explains that he quit because he was in pain and needed to get back to his hotel room to take his medications, but he felt like he could not leave while Basnight was following him and trying to talk to him. (Bishop Dep. at 96, 101.) Basnight apparently did not understand this causal connection, though he mentioned to HR that Bishop's illness might be a "pressure point," among several other possibilities. (ECF No. 147 at 215–16.) But Basnight was not aware of any of Bishop's ongoing medical problems. (*Id.*)

*Attempts to revoke resignation.* Bishop returned to his hotel and took a nap. That night, Meghan Nelson, an HR representative for SJM, called Bishop. (Bishop Dep. at 112.) Nelson told Bishop she wanted to meet the following morning for an exit interview because of his resignation. (*Id.*) Bishop replied to say he had no intention of leaving and that he did not resign. (*Id.* at 113.)

Nelson and Bishop met the next morning, on August 23. At that meeting, SJM and Bishop discussed "next steps" including the possibility of a performance improvement

5

plan. (ECF No. 147 at 308.) Bishop reiterated that he did not intend to resign. (ECF No. 166-4 at 69.) After that meeting, SJM had not decided whether to accept Bishop's resignation. (*Id.* at 71.) On August 26, Nelson sent a letter to Bishop to confirm and accept his resignation. (ECF No. 147 at 183.) Three days later, Bishop sent a letter stating he had not intended to resign. (ECF No. 147 at 185.) August 31 was Bishop's last day, and SJM paid him until September 9, the end of the pay period. (ECF No. 147 at 187.)

At no time did Bishop tell anyone at SJM that he had transverse myelitis, that his outburst was a result of his pain, or that he was taking prescription medications for pain. (*See* Bishop Dep. at 122–25 (explaining that he did not tell SJM about his medications or his condition).)

## ANALYSIS

### I. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come

forward with specific facts showing that there is a genuine issue for trial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (citation omitted). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Id*. (quoting *Celotex*, 477 U.S. at 322–23).

## II. Disability Discrimination

Because Bishop presents no direct evidence of discrimination, his claims under the California Fair Employment and Housing Act ("FEHA") are evaluated under a burden-shifting approach that mirrors the *McDonnell-Douglas* standard applied to ADA disability discrimination claims. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, Bishop must state a *prima facie* case for disability discrimination. *Id.* at 354. If he does, the burden shifts to SJM to show a legitimate, non-discriminatory reason for the adverse action. *Id.* at 355–56. Then, the burden returns to Bishop to show the employer's stated reason was pretext for discrimination. *Id.* at 356.

*Prima facie case.* To establish a *prima facie* case for disparate treatment disability discrimination, a plaintiff must show: "(1) he suffers from a disability; (2) he is otherwise qualified to do his job; and (3) he was subjected to adverse employment action because of his disability." *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 344 (2008). The parties dedicate much of their briefing to arguing about the *prima facie* case and issues of fact

7

abound. The Court need not resolve these issues because it finds that no reasonable jury could conclude that SJM's stated reason for terminating Bishop was pretext for disability discrimination. Thus, even if Bishop has stated a *prima facie* case, his claim would fail.

*Legitimate reason for termination.* SJM terminated Bishop because of his expletive-laced public outburst. Bishop argues that this reason for termination is itself discriminatory because his outburst was "conduct resulting from a disability. . . ." *Humphrey v. Memorial Hospital Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001). Accepting as true that Bishop's outburst was caused by the pain of his transverse myelitis, his argument nonetheless fails because he cannot show that SJM knew about his disability when it accepted his resignation.

"An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer." *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236 (Cal. App. 1997). "[U]nless there is some evidence an employer knows an employee is suffering from a disability, it is impossible for an employee to claim he or she was discharged because of it." *Featherstone v. S. California Permanente Med. Grp.*, 10 Cal. App. 5th 1150, 1167–68 (2017) (citation omitted). At times, an employer's "knowledge of the disability can be inferred from the circumstances," but the disability must be the "the only reasonable interpretation of the known facts." *Brundage*, 57 Cal. App. 4th at 237. "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice" of an employee's disability. *Id.*

It is undisputed that Bishop did not tell Basnight or others at SJM that he had transverse myelitis before he resigned. So if SJM knew of Bishop's disability, it must have been inferred from the circumstances. Basnight knew that Bishop had an illness because of Bishop's leave several months prior and because Bishop said he was in pain before he resigned. After Bishop's outburst, Basnight briefly suspected that Bishop's illness might be a pressure point for him, but this internal speculation that an illness might be at play cannot translate to SJM's knowledge of a disability when, as here, it is not the only reasonable interpretation of the facts. *Brundage*, 57 Cal. App. 4th at 237.

Put differently, an employer's awareness that an employee had *some illness* at *some point* is not the same as present knowledge of the symptoms of a disability.[2] When Bishop

---

[2] For this reason, the cases Bishop cites are inapposite because they involve employers who knew of the employee's disability and the nature of the disability. In *Humphrey*, for example, an employee with OCD was fired for "attendance problems" after the interactive process broke down. 239 F.3d at 1139–40. The employer knew that the employee had OCD and that absenteeism might be caused by OCD. *See id.* at 1138–39 (explaining that the employer attempted to accommodate the employee's OCD with flexible start times, but the employee continued to accumulate unreported absences). And in *Gambini*, a case under the ADA and Washington state law, the employee informed her supervisor that she had bipolar disorder and requested accommodations. *Gabini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1094 (9th Cir. 2007). The employee "had informed her supervisors about her condition and kept them apprised of her medication issues and the various accommodations she thought might reduce the chances of an outburst at work." *Id.* She later had a violent outburst and was terminated for that outburst, which may have been a symptom of her bipolar disorder. *Id.*; *see also Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 876 (8th Cir. 1989) (concerning a failure to accommodate claim by an employee who was terminated for attendance problems caused by a migraine condition. The case turned on the employer's knowledge of the employee's condition, even though it was undisputed that the absences were caused by the condition.).

9

took a leave of absence several years prior, neither the leave approval nor his return-to-work paperwork indicated the nature of his disability. (ECF No. 147 at 176–80.) So the Court cannot impute knowledge of the disability from the fact of his leave.[3] *See Brundage*, 57 Cal. App 4th at 237 (declining to impute knowledge to an employer from leave requests that did not include details about the disability). And without more details, Bishop's statements that he was in pain and needed to take medication did not put SJM on notice of a disability. *See Arteaga*, 163 Cal. App. 4th at 350 (finding that the company had no reason to believe an employee had a disability based on complaints about pain and numbness that did not affect the achievement of job duties). Thus, SJM had a legitimate reason to terminate Bishop.

*Pretext*. Because SJM put forth a legitimate, non-discriminatory reason for Bishop's termination, the burden returns to Bishop to show that SJM's stated reason for

---

Thus, the mere fact that Basnight speculated that Bishop's illness may be part of the reason for his outburst does not support an inference that Bishop was terminated because of a disability since SJM did not know what Bishop's disability was nor the symptoms of the disability.

[3] Bishop also asks the Court to infer that SJM knew about Bishop's disability because it knew he was hospitalized. As with his leave, Bishop was hospitalized more than a year before the incident, so the Court does not find that there's any reason to infer knowledge of a disability from the mere fact of hospitalization. The case Bishop cites in support, *Rizzio v. Work World America, Inc.*, does not support his position. 2015 WL 5601352, at *5 (E.D. Cal. 2015). In *Rizzio*, a court considering a motion to dismiss inferred that an employee had a disability from a complaint that pled a condition requiring hospitalization. *Id*. The *Rizzio* court did not consider whether a factfinder could infer an employer's knowledge of an employee's disability from the employer's knowledge of an employee's hospitalization.

terminating him was pretext for discrimination. Bishop must "persuad[e] the court that a discriminatory reason more likely motivated the employer or . . . show[] that the employer's proffered explanation is unworthy of credence." *Batarse v. Serv. Employees Intrnat. Union, Local 1000*, 209 Cal. App. 4th 820, 835 (Cal. Ct. App. 2012). Because Bishop offers no evidence that SJM had a discriminatory reason to terminate him and relies instead on circumstantial evidence, he must produce "specific and substantial" evidence that SJM's stated reason was "untrue or pretextual" or evidence of "discriminatory animus." *Id.* at 834 (quotation marks omitted).

Bishop makes little argument about pretext. He points briefly to Basnight's shifting testimony about a hiking trip Bishop took. (ECF No. 163 at 46.) A few weeks before the training and Bishop's resignation, Bishop hiked Half Dome, a difficult trail in Yosemite National Park. (ECF No. 147 at 390.) At one point, SJM represented that Basnight thought Bishop was in pain at the training because of this hike. (ECF No 165 ¶ 14.) In his testimony, Basnight did not know what Half Dome was. (ECF No. 171 at 27.) This inconsistency alone does not give rise to an inference of a discriminatory reason for terminating Bishop: at best it creates a credibility issue that a factfinder could consider if the case ever reached that stage.

Because Bishop presents no evidence that SJM terminated him for a discriminatory reason and no other evidence of pretext, the Court grants SJM's motion for summary judgment on the employment discrimination claim and denies Bishop's.

11

### III. Derivative Claims and Punitive Damages

Bishop also raises derivative claims for failure to prevent discrimination and wrongful termination. (ECF No. 79 ¶¶ 57–71.) SJM moves for summary judgment on these claims as well. (ECF No. 144.) There can be no derivative claims without disability discrimination, thus the Court grants SJM's motion for summary judgment on these claims. *Featherstone*, 10 Cal. App. 5th at 1166, 1169–70. Because the Court grants SJM's motion for summary judgment on the claims, the issue about Bishop's failure to follow pleading rules concerning punitive damages is moot.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. St. Jude Medical S.C., Inc.'s motion for summary judgment (ECF No. 144) is GRANTED; and

2. Bishop's motion for partial summary judgment (ECF No. 150) is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 27, 2022                                        BY THE COURT:

                                                                      s/Nancy E. Brasel
                                                                      Nancy E. Brasel
                                                                      United States District Judge